DaVINCI CREATIONS, INC.

v.

NU-FRAME CO., INC.

No. 78–77–Appeal.

Supreme Court of Rhode Island.

Aug. 15, 1980.

Selya & Iannuccillo, Inc., Anthony G. Iannuccillo, Robert A. Goldberg, Providence, for plaintiff.

Hanson, Curran & Parks, Robert D. Parrillo, Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is a civil action in negligence for property damage and loss of profits incurred by the plaintiff, DaVinci Creations, Inc. (DaVinci), as a result of a fire that allegedly originated on the premises of the defendant, Nu-Frame Co., Inc. (Nu-Frame). The complaint was in two counts, the first alleging specific negligence by the defendant, the second alleging negligence inferentially under the so-called "doctrine of exclusive control." At the close of all the evi-

dence, the defendant moved for a directed verdict on both counts. The trial justice, sitting with a jury, granted the motion in regard to the second count but sent the specific-negligence count to the jury. The jury returned a verdict for the defendant. On appeal, the plaintiff's only contention is that the trial justice improperly granted the defendant's motion for a directed verdict on the exclusive-control count.

The parties in this action, both Rhode Island and corporations engaged in the manufacture of costume jewelry, were commercial tenants in a four-story building at 244 Oak Street in Providence. At 6:09 a. m. on January 17, 1973, the Providence fire department arrived at the Oak Street premises in response to an alarm tripped by the activation of two sprinkler heads. The fire department discovered a smoldering fire which had burned through the ceiling from the fourth floor, occupied by defendant, to the third floor, occupied by plaintiff. The plaintiff's merchandise stored on the second and third floors suffered damage caused by water sprayed primarily from plaintiff's sprinkler head located just below the ceiling on the third floor, very close to the point where the fire had burned through from the fourth floor.[1]

The plaintiff introduced evidence to show that the fire had originated in front of or underneath a jack lathe, a machine used to polish metal, located in defendant's shop on the fourth floor.[2] The plaintiff's expert witness, Frank McArdle, a mechanical engineer and consultant, testified that he had inspected defendant's premises two days after the fire, at which time he took photographs and performed cursory electrical tests on the jack lathe. He noted that the right buffing wheel of the jack lathe was partially charred, that the jack lathe's switchbox wiring insulation was burned out, and that the floor was charred in a pattern flaring out from the base of the jack lathe pedestal. Although the results of McArdle's electrical tests were not sufficiently conclusive to enable him to pinpoint the components that might have caused the fire, they revealed that the electrical resistances were very low, indicating that the terminals in the jack lathe's switch box had short-circuited.[3] From the evidence, McArdle concluded that the fire had originated on the floor near the jack lathe, probably ignited by sparks from the switch box.[4]

Egidio DiNunzio, defendant's supervisor, testified that he and his brother, Philip, Nu-Frame's president, had bought the jack lathe "brand new" in 1947 or 1948, that they had used it regularly only for a couple of years, and that thereafter they had only used it "very, very seldom." DiNunzio testified also that an electrician had originally installed the jack lathe and connected the wiring and that it had remained in good condition and had never needed repair. DiNunzio also stated that only he had ever

1. The defendant's sprinkler head, which presumably contributed to the damage, was just below the fourth floor ceiling, about ten to twelve feet above the floor. It was not, however, directly above the jack lathe, and defendant's witnesses were unable to explain why its sprinkler head had been activated.

2. The jack lathe motor sits atop a pedestal that is about two-and-a-half to three feet high. Spindles extend from the left and the right sides of the motor. At the end of each three-foot spindle is a fourteen-inch diameter buffing wheel. A sheet-metal hood on a stand partially covers each buffing wheel.

3. Attached to the front of the pedestal is a switch-control box that is covered by a metal plate. Electric power is fed from the electrical system through the switch box to the motor, controlled by an "on-off" button mechanism. The expert tested the switch control for conti-

nuity of the electric circuit and for electrical resistance of the circuit. He made tests at four terminal connections to the "on-off" buttons in the control box.

4. The photographs taken on January 19 showed that the metal plate designed to cover the switch-control box had been removed and that the "on" button had been depressed. The plaintiff relied on these photographs impliedly as circumstantial evidence that the jack lathe's motor had probably been left on during the night and that sparks from a short circuit could have freely jumped out from the uncovered switch control box onto the floor. What these photographs suggested was directly contradicted by defendant's witnesses, who testified that the metal cover plate was properly attached and that the motor was off.

operated the machine and that he had not operated it for at least six months before the fire, and certainly not on January 16. Both brothers testified that they made a daily routine of checking the premises before departing to ensure that everything was secured and locked and that no motors were running. They both testified that they had performed this ritual on the evening before the fire and had left everything in order.

The only issue before this court is whether the trial justice properly granted in part defendant's motion for a directed verdict. On such a motion, the trial justice, and this court on review, must examine the evidence in the light most favorable to the plaintiff, must draw all reasonable inferences in support of the plaintiff's position, but must neither weigh the evidence nor pass on the credibility of the witnesses. *Carnevale v. Smith*, R.I., 404 A.2d 836, 838 (1979); *Conlin v. Greyhound Lines, Inc.*, R.I., 384 A.2d 1057, 1061 (1978); *Evans v. Liguori*, 118 R.I. 389, 394, 374 A.2d 774, 776 (1977). In order to escape direction of a verdict, a plaintiff relying on the doctrine of *res ipsa loquitur*[5] must come forth with evidence sufficient to establish that: (1) the event was a kind that ordinarily would not occur in the absence of someone's negligence, (2) the agency or instrumentality causing the event must have been within the defendant's exclusive control, and (3) the event must not have been due to any voluntary act or contribution on the part of the plaintiff. *Carnevale v. Smith*, 404 A.2d at 840; *Wilkinson v. Vesey*, 110 R.I. 606, 631, 295 A.2d 676, 691 (1972). If the plaintiff satisfies these preliminary elements of the doctrine, he has established a prima facie case in negligence, and the trial justice will send the case to the jury. It is then up to the jury to decide whether the plaintiff's direct and circumstantial evidence is strong enough to support the conclusion that the defendant was negligent and that the defendant's negligence proximately caused the plaintiff's injury. When, however, at the close of the case, the evidence does not disclose a sufficient balance of probabilities in favor of negligence, the doctrine is inapplicable as a matter of law, and the trial justice must direct a verdict in favor of the defendant. *See Carnevale v. Smith*, 404 A.2d at 840 (citing Prosser, *Law of Torts*, § 39 at 211–12, 218 (4th ed. 1971)).

On many occasions this court has stated that the mere occurrence of a mishap, standing alone, does not warrant an inference that someone was negligent. *See Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d 583, 585 (1979); *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 312, 342 A.2d 622, 625 (1975); *Goyette v. Sousa*, 90 R.I. 8, 15–16, 153 A.2d 509, 513 (1959). To satisfy the first element of the doctrine, therefore, a plaintiff bears a burden to show affirmatively that the mishap was of a kind that would not have occurred without negligence.[6] Once this has been established, a preliminary inference of negligence will be warranted, and the trial justice may then proceed to his examination of the evidence relating to the second and third elements of the doctrine, which focus on who may have been negligent.

As a particular species of mishap, the occurrence of a fire, by itself, will not ordinarily invoke the application of the doctrine of *res ipsa loquitur*. *See* 2 Speiser, *Res Ipsa Loquitur* §§ 19:1–19:3 (1972); Prosser, *Law of Torts*, § 39 at 216. Courts have been especially reluctant to apply the doctrine to fires, "since a fire can result without negli-

---

5. Although plaintiff's second count was apparently based on the so-called "doctrine of exclusive control," we shall discuss the issue with reference to the doctrine of *res ipsa loquitur*, which we have recently held to be the only proper doctrinal basis in such a case. *See Montuori v. Narragansett Elec. Co.*, 418 A.2d 5 (R.I., 1980).

6. In the words of Dean Prosser, "[a]ll that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause of the event than that there was not." Prosser, *Law of Torts*, § 39 at 218 and n. 19 (4th ed. 1971).

gence on the part of anyone, or from one or more of a variety of possible causes which defy isolating the defendant as the responsible party." Speiser, *supra*, § 19:1 at 102; *see Highland Golf Club v. Sinclair Refining Co.*, 59 F.Supp. 911, 919 (N.D.Iowa 1945). The difficulty of proof which a plaintiff may confront in isolating the probable fire-causing agency or instrumentality often prevents him from satisfying the first element of the doctrine—that to a reasonable probability the fire was the result of negligence. *See Tedrow v. Des Moines Housing Corporation*, 249 Iowa 766, 771–72, 87 N.W.2d 463, 467 (1958); *Cambro Co. v. Snook*, 43 Wash.2d 609, 617, 262 P.2d 767, 770 (1953); *Arledge v. Scherer Freight Lines, Inc.*, 269 Wis. 142, 150–51, 68 N.W.2d 821, 826 (1955).[7]

■■■ In a *res ipsa loquitur* case a plaintiff, in attempting to establish his proof, may introduce expert testimony in order to assist the trial court in pinpointing the probable accident-causing agency or instrumentality or to offer a tenable theory of the probable manner in which the accident occurred. *See Wilkinson v. Vesey*, 110 R.I. at 631, 295 A.2d at 691; *Kearner v. Charles S. Tanner Co.*, 31 R.I. 203, 76 A. 833 (1910). *See generally Note, The Use of Expert Evidence in Res Ipsa Loquitur Cases*, 106 U.Pa. L.Rev. 731 (1958). The expert testimony regarding causation may enable a trial justice to make a reasonable judgment concerning whether a plaintiff has satisfied the first element of the doctrine. We have held, however, that an expert positing a theory of causation in a negligence case must speak in terms of strong "probability." *See Montuori v. Narragansett Elec. Co.*, (R.I., 1980); *Evans v. Liguori*, 118 R.I. at 398, 374 A.2d at 778; *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. at 313, 342 A.2d at 625;

*Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 355, 333 A.2d 411, 415 (1975).

■ The photographs taken by plaintiff's expert clearly indicated that the fire had originated in or near the jack lathe, and the inference is justifiable that the jack lathe was somehow involved in the origin of the fire. The probable manner in which the actual kindling took place, however, was left to conjecture. The plaintiff's expert suggested that the wiring could somehow have short-circuited and that sparks or burning metal could have jumped out from the jack lathe's switch box onto the floor in front of the jack lathe pedestal, resulting in the ignition of the floor. We do not dispute that this may have happened. The expert conceded, however, that other causes were possible. The trial court, therefore, could do no more than surmise whether either the short circuit, the burned wiring, or the charred buffing wheel was the cause rather than the result of the fire.

When a suggested cause of a fire cannot be stated as more probable than any other, or when an agency or instrumentality causing a fire cannot be specified with a sufficient degree of certitude, the factfinder is left to speculate about the existence of negligence. We believe that such is the case here. We cannot say, therefore, that the expert's testimony met the strong-probability standard by which we evaluate the probative value of an expert opinion introduced to establish an evidentiary basis for causation in negligence cases. *See Sweet v. Hemingway Transport, Inc.*, 114 R.I. at 355, 333 A.2d at 415.

Our examination of the record reveals that the trial justice based his decision to grant the defendant's motion for a directed verdict on the conclusion that the plaintiff

---

7. In previous Rhode Island cases not involving fires, where plaintiffs have succeeded in satisfying the first element of the doctrine, the specific agency or instrumentality responsible for plaintiff's injury has generally been ascertained. *Compare Cinq-Mars v. Kelley*, 95 R.I. 515, 188 A.2d 379 (1963) (cable on defendant's crane snapped) *and Coia v. Eastern Concrete Products Co.*, 85 R.I. 128, 127 A.2d 858 (1956) (rung on defendant's ladder broke) *with Carnevale v. Smith*, R.I., 404 A.2d 836 (1979) (agency or instrumentality could not be ascertained; doctrine inapplicable).

had failed to establish the second element of the doctrine of *res ipsa loquitur*, the defendant's exclusive control over the agency or instrumentality that allegedly caused the fire. *See Goyette v. Sousa*, 90 R.I. 8, 16–17, 153 A.2d 509, 514 (1959). In view of our conclusion that the plaintiff failed to demonstrate that, to a reasonable probability, the fire would not have occurred in the absence of negligence, we do not address the issue of exclusive control.

The plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

DORIS, J., did not participate.